No. 14743

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

IN RE THE MARRIAGE OF

PAUL W. HERRON,

Petitioner and Respondent,

vs.

SHARON M. HERRON,

Respondent and Appellant.

Appeal from: District Court of the Eleventh Judicial District,
In and For the County of Flathead.
Honorable Robert C. Sykes, Judge presiding.

Counsel of Record:

For Appellant:

Murphy, Robinson, Heckathorn and Phillips, Kalispell,
Montana

For Respondent:

Hash, Jellison, O'Brien and Bartlett, Kalispell,
Montana

Submitted on briefs: November 11, 1979

Decided: MAR 10 1980

Filed: MAR 10 1980

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal by Sharon M. Herron on the distribution of property in this matter. Her former husband, respondent Dr. Paul Herron, brought an action for dissolution, custody, and a division of the couple's property in the District Court of the Eleventh Judicial District, in and for the County of Flathead. By agreement of the parties, and with the approval of the court, the wife retained custody of the four minor children. Upon trial, the District Court, sitting without a jury, dissolved the marriage and, subject to certain minor exceptions, divided the property equally between the parties. The court retained jurisdiction in the matter for the sole purpose of effectuating the "even division." The court also ordered child support in the amount of $300 per month per child and maintenance payments of $400 per month for 48 months.

At the time of the marriage on July 21, 1962, Dr. Herron was a board-certified thoracic and vascular surgeon practicing in Seattle, Washington. Mrs. Herron was a registered nurse employed as a surgical nurse in Seattle. This was Dr. Herron's second marriage and the first marriage for Mrs. Herron. Dr. Herron had a family by his previous marriage. The testimony indicates that through the early years of this marriage Dr. Herron supported another family, but does not indicate the amount of support or for what period of time.

The parties lived in Seattle where Dr. Herron practiced until 1967 when the family moved to Connecticut where he did research for the Sterling Drug Company for 18 months. The family then moved to New York where Dr. Herron continued to do research.

In 1972 the family moved to Kalispell, Montana, where Dr. Herron joined the surgical practice of a Dr. Lipinski. In recent years, Dr. Herron's net income from his medical practice has been in excess of $45,000 per year.

As previously noted, Mrs. Herron was working as a registered nurse in Seattle when she married Dr. Herron. She continued to work as an R.N. until November 1963, when she quit work because of a physical disability. From that time until August 1965, she maintained four foster children in the household. There are four children of this marriage: Reid, born August 27, 1965; Mark, born March 9, 1966; Shelbey, born September 4, 1967; and, Jamey, born September 25, 1970. Jamey, the youngest, has a learning disability that requires special care and special education.

At the time of the dissolution of this marriage, the parties owned the following assets:

(1) The Ranch - This consists of some 80 acres and a home with a swimming pool, located in the Flathead Valley between Columbia Falls and Kalispell.

(2) The Lake Place - This consists of approximately 3-1/3 acres with 135 feet of Flathead Lake front near Big Fork, Montana.

(3) The Paul Herron Medical Practice and Ownership in the Kalispell Medical Arts Building.

(4) The Sharon Herron Home - This is the home occupied by Mrs. Herron and the four children.

(5) The George Robbin Estate - Mrs. Herron's father, George Robbin, willed his property to Dr. and Mrs. Herron. Dr. Herron acquired an interest in the real and personal property of a gross value of approximately $143,000 and Mrs. Herron acquired an equal amount, but in addition, life

-3-

insurance in the amount of $19,841.39 and other joint assets in the amount of $4,234.84, or a gross estate of $167,242.46, which was subject to costs and taxes.

(6) Miscellaneous Property - Both parties have miscellaneous personal property which has been divided between them. The division of the miscellaneous property is not contested on appeal.

The Herrons acquired many of the above-listed assets as a result of gifts from Mrs. Herron's father. The Herrons purchased a home while living in Seattle. Mrs. Herron sold several life insurance policies held in her name to provide a partial downpayment on the home. Her father gave the couple the money necessary for the remainder of the down payment. When the Herrons moved to Connecticut, they sold the Seattle home and used the proceeds of the sale for a downpayment on a home in Connecticut. The couple repeated the process when they moved to New York. The Herrons used the proceeds from the sale of their New York home to make a downpayment on the Flathead Lake property when they moved to Kalispell. Thus, the acquisistion of the lake property is traceable to a gift from Mr. Robbin.

When the couple moved to Kalispell, Mr. Robbin bought a house for the family. He paid $46,000 for the home. The Herrons subsequently sold the house for $46,000 and used the money from the sale as a downpayment on their ranch property. Mr. Robbin also gave the Herrons approximately $59,000 to build an addition onto the house located on the ranch. Therefore, approximately $105,000 of the equity the Herrons have accumulated in the ranch came from gifts from Mr. Robbin.

-4-

In addition, Mr. Robbin gave Dr. Herron $7,500 which was used by Dr. Herron to buy into the office building and partnership owned by Dr. Lipinski when Dr. Herron set up practice in Kalispell. The couple also received a substantial sum of money from Mr. Robbin's estate. The sale of the home owned by Mr. Robbin provided the funds for the down-payment on the home Mrs. Herron presently occupies. The remainder of the estate represents a majority of the couple's liquid assets.

The issue before the Court is whether a basically 50/50 division of marital property between Dr. and Mrs. Herron is equitable under the circumstances relating to the acquisition of the property by the parties.

We clearly and accurately set out the standard for reviewing property divisions in dissolution proceedings in In Re the Marriage of Brown (1978), _____ Mont. ____, 587 P.2d 361, 35 St.Rep. 1733. In Brown we said:

> "The apportionment made by the District Court will not be disturbed on review unless there has been a clear abuse of discretion as manifested by a substantially inequitable division of the marital assets resulting in substantial injustice." Brown, 587 P.2d at 364, 35 St.Rep. at 1736.

See also In Re the Marriage of Aanenson (1979), _____ Mont. ____, 598 P.2d 1120, 1123, 36 St.Rep. 1525, 1528; In Re the Marriage of Kaasa (1979), ___ Mont. ___, 591 P.2d 1110, 1113, 36 St.Rep. 425, 428; In Re the Marriage of Kramer (1978), ___ Mont. ___, 580 P.2d 439, 442, 35 St.Rep. 700, 704. In reviewing the property division ordered by the District Court in this case, we find the lower court abused its discretion.

The basis for the error in the distribution of the Herrons' property is the failure of the District Court to follow the provisions of section 40-4-202, MCA. Section 40-4-202(1) directs the District Court to apportion marital assets ". . . belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both." That language clearly indicates the District Court should consider all the Herron property, including that received by gift or bequest from George Robbin, in dividing the marital estate. See also Brown, 587 P.2d at 365, 35 St.Rep. at 1737; In re the Marriage of Vivian (1978), ___ Mont. ___, 583 P.2d 1072, 1074, 35 St.Rep. 1359, 1362; Morse v. Morse (1977), ___ Mont. ___, 571 P.2d 1147, 1149, 34 St.Rep. 1334, 1337. The District Court here included all the gift property in the marital assets, thus complying with this requirement of section 40-4-202(1), MCA.

The statute goes on to state:

". . . In disposing of property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:

"(a) the nonmonetary contribution of a homemaker;

"(b) the extent to which such contributions have facilitated the maintenance of this property; and

"(c) whether or not the property disposition serves as an alternative to maintenance arrangements." Section 40-4-202(1), MCA.

This part of the property distribution statute establishes the criteria for determining an equitable division of property brought to the marriage, acquired by gift or bequest during the marriage and acquired after a decree of legal separation. The statute requires the court to consider the contributions of the non-acquiring spouse to the marriage in dividing these types of property. In re the Marriage of Herring (1979), ___ Mont. ___, 602 P.2d 1006, 1007, 36 St.Rep. 2052, 2054. In determining the exact distribution of this type of marital asset, no set formula can be established as to how the assets should be equitably distributed. Each case has to be decided on its own merits. In re the Marriage of Metcalf (1979), ___ Mont. ___, 598 P.2d 1140, 1143, 36 St.Rep. 1559, 1563; Vivian, 583 P.2d at 1074, 35 St.Rep. at 1362; Morse, 571 P.2d at 1147, 1150, 34 St.Rep. at 1338.

It is in the application of this aspect of the disposition statute that the District Court failed to comply with section 40-4-202(1), MCA. In light of this section, the property distribution order is so inequitable as to represent an abuse of discretion.

The inequity of the 50/50 property division becomes apparent after considering the source of the marital assets of the parties. Almost all of the property accumulated by the Herrons can be traced to gifts or bequests from George Robbin.

The couple purchased the ranch property for $65,000, added approximately $59,000 worth of improvements to the ranch house, and installed a pool on the property at a cost of $15,000. Total expenditures for the ranch and improvements thus equal approximately $140,000. Mr. Robbin gave

the Herrons over $100,000 of the $140,000 they spent on the property. The Flathead Lake property was purchased with money from the sale of homes for which Mr. Robbin originally gave the Herrons a part of the downpayment. Mr. Robbin gave Dr. Herron the money he needed to buy into his medical practice in Kalispell. Mrs. Herron bought the home she and the children now reside in with the proceeds from the sale of the Robbin's family home, which the couple inherited from George Robbin. The other main marital asset, the George Robbin Estate, originated from a devise from Mrs. Herron's father.

George Robbin thus gifted or bequeathed over a quarter of a million dollars to the Herrons during the course of their marriage. The property was given to the Herrons jointly, but Mr. Robbin certainly did so to provide for his only daughter. The property should be considered as principally gifts to Mrs. Herron.

Given the fact that most of the marital assets were accumulated via gifts from Mrs. Herron's father, Dr. Herron's contributions to the marriage from other sources would have to substantially outweigh Mrs. Herron's to render equitable a 50/50 division of the couple's assets. That simply is not the case here. For the first year of the marriage, both the parties worked. Mrs. Herron then assumed the duties of caring for the couple's home. She also cared for foster children brought into the home and later for the couple's four natural children. Dr. Herron supported the family financially with income from his medical practice. The marriage had all the characteristics of a couple working together and contributing equally toward the accumulation and maintenance of the marital assets. Mrs. Herron main-

tained the family home and cared for the couple's children, enabling Dr. Herron to practice his profession. Dr. Herron practiced medicine, providing the income to support Mrs. Herron and the children. There is no evidence that Dr. Herron contributed more to the marriage than Mrs. Herron. In fact, the evidence is to the contrary, as Dr. Herron testified that part of his income went to pay alimony and child support for his former wife and the children of his first marriage.

We have considered similar situations in several recent cases. In In re the Marriage of Balsam (1979), ___ Mont. ___, 589 P.2d 652, 36 St.Rep. 79, Mr. Balsam's parents gave him some shares in the family business valued in excess of $50,000. The District Court considered the stock a part of the marital assets, but awarded Mrs. Balsam no interest in the stocks on dissolution of the marriage. The District Court reasoned that since the stocks had not appreciated during the marriage, none of their value could be a product of contribution from the marital effort. Balsam, 589 P.2d at 654, 36 St.Rep. at 83. We affirmed the decision and rationale of the lower court.

In Brown, supra, Mr. Brown inherited a ranch from his father. He and Mrs. Brown worked the ranch together for 14 years. The ranch was valued between $350,000 and $450,000 at the time of dissolution of the Browns' marriage. The District Court awarded Mrs. Brown $25,000, or between 5 and 7 percent of the total value of the ranch, as her equitable share of the property. This Court found that Mrs. Brown acquired a vested interest in the ranch property regardless of its source by virtue of her 14 years as a mother, house-wife and parttime ranch hand. Brown, 587 P.2d at 365, 35

-9-

St.Rep. at 1737. We held that awarding her such a small amount of the total valuation of the ranch represented an inequitable division of the marital asset. Brown, 587 P.2d at 365, 35 St.Rep. at 1737-1738.

In Metcalf, supra, Mr. Metcalf had received an inheritance five years prior to dissolution of the marriage. The Metcalfs' earnings at the time they received the inheritance were such that they spent the money for the normal expenses of the marriage. We found it impossible for the District Court to trace the inheritance under these circumstances. Metcalf, 598 P.2d at 1143, 36 St.Rep. at 1563. We held that a District Court faced with this predicament could not be required to "'. . .become an appraiser, an accountant, a computer, and an all-around genius . . .'" and enter specific findings regarding an inheritance expended in this fashion. Metcalf, 598 P.2d at 1143, 36 St.Rep. at 1563 (citing Downs v. Downs (1979), ___ Mont. ___, 592 P.2d 938, 939, 36 St.Rep. 577, 579).

These cases set out some broad guidelines for an equitable division on dissolution of property acquired via gift or bequest to one party to the marriage.

The gift must be traceable before the District Court will be required to make specific findings regarding the property. Metcalf, supra. If none of the value of the property is a product of contribution from the marital effort, the District Court can justifiably find that the non-acquiring spouse has no interest in the property. Balsam, supra. If, on the other hand, both parties to the marriage contribute to the maintenance and thus the appreciated value of the gift property, it is inequitable to award the non-acquiring spouse only a fraction of the value of the asset on dissolution. Brown, supra.

-10-

The facts here do not fall squarely under any of the previously decided cases. Unlike Metcalf, the gift property is definitely traceable. We are not presented with the Balsam situation of no contribution to the maintenance of the asset and no appreciation of the property during the marriage. We do have a set of facts involving equal contribution to the maintenance of the gift assets and appreciation of the assets as in Brown. The District Court here, however, has not awarded substantially all the gift property to the acquiring spouse.

The situation lies somewhere between the results reached in Balsam and Brown. The facts do not warrant the total denial of any interest in the gifted marital assets by the non-acquiring spouse justified in Balsam. Both parties here contributed to the maintenance of the assets, and the assets have appreciated. By the same token, just as in Brown, the District Court would not be justified in awarding the non-acquiring spouse only a small fraction of the total value of the gift property because of the joint contribution to maintaining the property and the appreciation of the property. Both parties here should share equally in the portion of the value of the gift property attributable to contribution from the marriage and appreciation during the marriage. The Herrons should not, however, share equally in the total value of the property since the marital assets came to the marriage principally as gifts for Mrs. Herron's benefit.

We therefore remand the case to District Court for retrial.

On remand, we direct the District Court to correct two additional errors in its handling of this case. We have

-11-

repeatedly stated the trial court must determine the net worth of the parties at the time of the divorce to have a proper distribution of the marital assets. Herring, 602 P.2d at 1007, 36 St.Rep. at 2054; Brown, 587 P.2d at 365, 35 St.Rep. at 1738; Vivian, 583 P.2d at 1074, 35 St.Rep. at 1361; Kramer, 580 P.2d at 443, 35 St.Rep. at 704. The nature of some of the property involved here illustrates the reason a net worth determination is necessary before an equitable distribution of property can be made. For example, Dr. Herron introduced an exhibit and gave testimony at trial valuing his medical practice at $7,500. To value at $7,500 an interest in a medical practice that includes part ownership in a clinic building, goodwill, accounts receivable totaling over $50,000, and a capacity for generating over $45,000 per year in income is, of course, ridiculous. Likewise, to award Mrs. Herron 50 percent of $7,500 as her equitable share of the medical practice, even absent the fact that her father gave Dr. Herron the money to buy into the practice, is patently inequitable.

There must be a judicial determination of the true worth of assets like Dr. Herron's medical practice before an equitable division of the marital assets can be made.

Despite our repeated statements of the necessity of determining net worth before dividing marital property, the District Court failed to do so here. We advise the court to do so on remand. In considering the family assets under the facts of this case, the court on remand should take into consideration how the joint estate of the couple was acquired and make an equitable distribution of the same. The 50/50 rule is not absolute when it brings about an inequitable distribution.

The second error by the District Court involves the maintenance award made in this case. Maintenance can only be awarded to parties lacking sufficient property to provide for their needs and unable to support themselves through appropriate employment. Section 40-4-203(1), MCA. The court cannot determine if the parties possess sufficient property to support themselves until the marital assets have been valued and divided. Therefore, the District Court should not award final maintenance payments until the marital assets have been valued and equitably apportioned. Vivian, 583 P.2d at 1075, 35 St.Rep. at 1362; In re the Marriage of Johnsrud (1977), ___ Mont. ___, 572 P.2d 902, 907, 34 St.Rep. 1417, 1423-1424. Here the marital assets have been neither valued nor equitably apportioned. The maintenance award should therefore be reviewed on remand.

In reviewing the maintenance award, we recommend that the District Court carefully consider the advisability of placing any time restrictions on the duration of the maintenance to Mrs. Herron. Section 40-4-203(2), MCA, sets out the considerations relevant to the amount and duration of a maintenance award. That subsection states:

> "The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, and after considering all relevant facts including:
>
> "(a) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
>
> "(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
>
> "(c) the standard of living established during the marriage;

"(d)   the duration of the marriage;

"(e)   the age and the physical and emotional condition of the spouse seeking maintenance; and

"(f)   the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance."

Considering these factors, Mrs. Herron is now 45 years old. She left the job market over 15 years ago in part because a physical disability made it difficult for her to work as a nurse. Her recent efforts to obtain and hold a job have met with minimum success at best. Mrs. Herron maintains a home for four children, the youngest of whom has a learning disability and may require Mrs. Herron's care for quite some time. Dr. Herron, on the other hand, is a practicing surgeon in the prime of his professional career. His employment allows him to earn in excess of $45,000 annually. This level of income would allow him to pay the support and maintenance ordered by the District Court and still retain approximately $25,000 annually for his own expenses. Additionally, the couple established a relatively high standard of living during their 16 years of marriage.

The court should also consider whether the property awarded to the parties is income consuming or income producing in determining the amount and duration of maintenance payments. Johnsrud, 572 P.2d at 905, 34 St.Rep. at 1421; Brawman v. Brawman (1962), 199 Cal.App.2d 876, 19 Cal.Rptr. 106, 110. Brawman illustrates the rationale for considering the nature as well as the amount of distributed property in determining adequate maintenance. The California court points out that the practical effect of a property division awarding income consuming property to one spouse and income

producing property to the other leaves one spouse in possession of property the spouse is unable to maintain while placing the other party in control of assets that generate a comfortable living. Brawman, 19 Cal.Rptr. at 110. The Brawman court found this situation inequitable and held that maintenance should be employed as a remedy. 19 Cal.Rptr. at 111.

Here we find the property awarded to Mrs. Herron, although possibly substantial in quantity, is income consuming in nature. The primary income producing marital asset, the medical practice and attendant goodwill, will be awarded to Dr. Herron. The danger exists of creating a situation in which Mrs. Herron would be "property poor", i.e. in possession of a large quantity of property but unable to generate the income to maintain the property. In contrast, the marital assets received by Dr. Herron should allow him to continue making a handsome salary. We agree with the Brawman court that maintenance payments to Mrs. Herron should be employed to compensate for the inequities inherent in this situation.

The considerations set forth in section 40-4-203(2), MCA, and the nature of the Herron marital assets to be distributed militate against limiting the duration of maintenance payments to Mrs. Herron. On remand we advise the District Court to reconsider its decision to do so.

For the above reasons, we remand the case for retrial on the issues of property disposition and maintenance.

John Conway Harrison
_____
Justice

-15-

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice John C. Sheehy concurring in part and dissenting in part:

I must respectfully dissent from the majority in concluding that the gifts from the wife's father to the couple must be counted as the wife's contribution in dividing the marital estate. The record shows that the gifts were made irrevocably to the couple. That being so, ownership of one-half of the gifts was vested in the husband at the time of the gifts. It may be in the light of after-events that the father would not have made those gifts to the husband had the father known what was in the future, but we cannot cure that with our hindsight. This Court is in no better position to reverse the ownership of the gifts than the father's executor would be. We might wish it otherwise, but that is the law.

_____
                Justice